UNITED STATES of America

v.

Alejo Maldonado MEDINA, César Caballero Rivera.

Crim. No. 82–196 GG.

United States District Court, D. Puerto Rico.

June 21, 1983.

Daniel F. Lopez Romo, Hato Rey, P.R., for U.S.

Harry Anduze Montaño, Carlos V. García Gutiérrez, Santurce, P.R., for defendants.

## MEMORANDUM OPINION STATING REASONS FOR DENYING BAIL ON APPEAL PURSUANT TO 18 U.S.C.A., SECTION 3148

GIERBOLINI, District Judge.

Defendants Alejo Maldonado Medina (Maldonado) and César Caballero Rivera (Caballero) together with others were indicted and convicted after a jury trial on a two count indictment for violation of Title 18 U.S.C.A. Sections 1951 and 2. The indictment charged that these defendants together with other indicted and unindicted persons, "unlawfully, willfully and knowingly combined, conspired, confederated and

agreed together with each other ... to obstruct, delay and affect commerce ... and the movement of articles and commodities in such commerce by extortion ...". It was also charged in Count 1 that as part of said conspiracy the defendants "would and did seize and cause to be seized, confined, kidnapped, abducted and did cause physical violence to be committed and threatened upon Mario Consuegra in order to obtain $500,000 in money and jewelry from his father, Francisco Consuegra ...". As an overt act of this conspiracy and in furtherance thereof, it was alleged that prior to the Consuegra kidnapping, the defendants had on March 28, 1982 kidnapped another person, Julio Cortés Meléndez, in order to obtain $200,000 in money from his father, Julio Cortés Parés. The methods, plans and techniques used in the kidnapping of· Julio Cortés Meléndez were identical to those used in the kidnapping of Mario Consuegra.

Count 2 charged the substantive offense of obstructing, delaying and affecting commerce by extortion.

# I

During the trial that lasted over a month, the prosecution presented over thirty witnesses and extensive documentary evidence. The defense also presented its witnesses and documentary evidence.

Roberto Stevenson Louis, one of the five persons indicted, pled guilty in Miami, Florida under Rule 20 of the Federal Rules of Criminal Procedure and turned state's evidence. Of the remaining four, the jury found Maldonado and Caballero guilty as charged in both counts. Defendant Jorge David Casanova Cruz was found guilty in Count One and not guilty in Count Two. Codefendant Wilman Suárez Garay, a youngster who was eighteen years old at the time of the alleged facts, and whose participation was peripheral, was found not guilty on both counts.

Juan A. Fuentes and Roberto Stevenson Louis, two of the witnesses presented by the prosecution, were full participants in the criminal activities charged in the indictment. During the trial they narrated in detail the manner in which both kidnappings were planned and executed. Their testimony was corroborated by real and documentary evidence as well as by the testimony of numerous agents of the Federal Bureau of Investigation (F.B.I.) and the local Bureau of Special Investigations that participated in the events that produced the arrest of Maldonado on the same evening that the ransom money was picked up in relation to victim Mario Consuegra. Their testimony was also fully corroborated by the testimony of the two victims Julio Cortés Meléndez and Mario Consuegra, and their respective fathers, who paid the ransom, as well as by tape recordings of the voice of defendant Maldonado, in which he requested and made arrangements for the delivery of the ransom money. The testimony of these two witnesses was so profusely and adequately corroborated by independent evidence that it resulted credible beyond reasonable doubt.

The evidence of guilt as to these defendants was overwhelming. It also showed that we are not dealing here with crimes committed in the spur of the· moment. To the contrary, these were very well organized schemes which required a great deal of planning and a carefully executed operation that can be conceived only by persons with ingrained criminal tendencies and with little or no·respect for the law and the dignity of other human beings. Defendants' actions were so meticulous and well calculated that in fact, one of the victims was placed under surveillance for three months and the other for close to six months in order to discover their personal habits, ways of life, and their daily movements and routines. The model of cars driven by them, the rate of speed and the driving habits of the potential victims were also carefully observed in order to ascertain the best possible place, time and circumstances to effect the actual kidnapping.

Moreover, the seriousness of the offenses for which these defendants stand convicted, cannot be overlooked due to their potentially violent overtones. It should be taken

into consideration that in spite of having obtained the ransom money, still one of the defendants discussed the possibility of killing the victim Mario Consuegra. Only the intervention of one of the indicted co-conspirators, Roberto Stevenson Louis, prevented this unnecessary death. Additionally, one of the victims was kept secluded, blindfolded and deprived of his liberty for two days. The other one was kept for four days in the back of a van, in total darkness. Both victims were kept in a state of constant fear for their lives.

We also note the substantial participation of defendants in other serious offenses as mentioned by co-conspirators Juan Fuentes and Roberto Stevenson Louis, who testified regarding the Consuegra and Cortés incidents—testimony which, as stated before, was completely corroborated by independent evidence and was believed by the jury and by this court.

## II

During the two-day hearing on the government's motion requesting that defendants be remanded to the custody of the Attorney General without bail pending appeal,[1] the court was presented with credible evidence, hearsay and non-hearsay, of a long list of serious crimes committed by Maldonado's organization. These crimes are now the subject of an intensive investigation by a special Task Force of the United States Department of Justice and the local Bureau of Special Investigations. A description of the crimes is as follows:

1) The murder on July 27, 1977 and burning of the body of Mr. Abraham Shafizadeh, a New York jeweler.

The evidence indicates that Maldonado escorted the body to deliver it to Caballero who in turn took the body to the town of Ciales in the mountainous part of the island. Caballero poured gasoline on the body and set it afire.

2) Robbery of a shipment of Timex watch heads worth $242,000.

The evidence shows that Maldonado planned this robbery and Caballero participated in it.

3) The armed robbery of ten vans full of cigarette cartons.

4) The armed robbery of a jeweler several years ago who kept jewelry and money at his home.

This was referred to as the El Sonorio incident and was apparently carried out on information provided by Maldonado.

5) The armed robbery of the Police Credit Cooperative which was apparently carried out by Caballero and Fuentes on information and orders provided by Maldonado.

6) Conspiracy to murder a well known racket numbers man in the Mayaguez area.

According to information provided by witness Juan Fuentes and electronic surveillance, Maldonado has admitted to owing this racket numbers man $14,000.

7) Armed robbery of a diamonds plant in Caguas in 1979 directed by Maldonado. The evidence indicates that this incident was based on information provided by Maldonado. $25,000 worth of diamonds was taken.

8) The Jessica murder. Jessica was the code name of a young woman who was a key witness in a criminal investigation. She was murdered while under the protective custody of the Police of Puerto Rico.

Reliable information reveals that Maldonado coached a witness prior to his testimony in an investigation being conducted by the Puerto Rico District Attorney's Office.

A partial transcript of the recording of a conversation between Julio César Andrades, a former police lieutenant and Maldonado which was examined in chambers and provided to attorneys for both sides, confirms this particular incident. This transcript was sealed by the court since it forms part of an ongoing investigation.

---

1. Defendants Maldonado and Caballero have been free on bail which was set at $375,000 and $200,000 respectively.

9) The armed robbery of a San Juan jeweler at the airport upon his return with $90,000 on his person.

This incident was based on information allegedly provided to Maldonado and Caballero by another San Juan jeweler.

10) Bribes and/or protection money.

There is evidence that Maldonado received $1,000 per month for protection from a San Juan jeweler.

11) A conspiracy to kidnap the son of San Juan jeweler Luis Gómez.

There is evidence that both Maldonado and Caballero were involved in this conspiracy.

12) There is also evidence that Maldonado and Caballero were involved in a conspiracy to kidnap the son of Jewels of the World's owner, Joel Jacobs.

13) There is evidence that Maldonado assigned the contract killing of a labor organizer in Bayamón to Caballero and Fuentes.

The evidence indicates that Caballero studied the situation but did not carry out the contract.

14) The armed robbery with an M–16 rifle of a numbers game racketeer ("bolitero") in Guánica, Puerto Rico.

The evidence indicates that the armed robbery was carried out by Caballero and the rifle used was either his or Maldonado's.

15) The theft of about $250,000 recovered from an arrest site by Maldonado and others.

There is evidence that in 1979 Maldonado and Andrades arrested three Dominican Republic criminals who had participated in several bank and federal food coupons robberies.

Even though the evidence shows that the sum of $250,000 was found at the arrest site, only a minimal part of that amount was turned over to the authorities.

A partial transcript of recorded conversations confirming this incident was examined in chambers and provided to the attorneys for both sides and was later sealed. This conversation also shows the luxury of Maldonado's residence in Caguas.

## III

The evidence adduced at the trial and during the hearing for the revocation of bail demonstrates that Maldonado was the mastermind of an organization comprised of around twenty-three persons dedicated to criminal activities that extend to most of the island of Puerto Rico. On the other hand, Caballero who was referred to as the lieutenant or second in command, was in charge of executing Maldonado's orders along with others.

We cannot overlook the fact that Maldonado was a high ranking officer of the Police of Puerto Rico, with rank equivalent to a Lt. Colonel, and a member of the faculty of the Police Academy who had the duty to train recruits and to instill in them the ideals of honesty, integrity and dedication to public service as law enforcement officers. This notwithstanding, his criminal organization has posed as policemen and used cars and methods similar to those used by real policemen to stop and detain their victims. This creates a situation where honest citizens stopped by real policemen would resist arrest or the request for identification, thinking that they might be kidnapped by persons that are not actually policemen. These actions by Maldonado under guise of his public office have tarnished the image of the Police of Puerto Rico thus creating a feeling of lack of trust in the Police of Puerto Rico which actually poses a danger to the general community of Puerto Rico.

Witnesses for the defense testified, and we have no reason to doubt, that Maldonado is a good family man, a kind neighbor and a person with a good image and reputation among the honest people who reside in his immediate community of Villa del Rey in Caguas, Puerto Rico. This notwithstanding, we note that it is customary for leaders of successful criminal organizations to cultivate and maintain a facade of respectability in their own close communities. This, however, does not detract from the fact that

according to the evidence adduced at the trial and other evidence submitted to the court, Maldonado commands an organization dedicated to criminal activities in Puerto Rico and that Caballero, the second in command, executes his orders. It is also a well known fact that leaders of criminal organizations cultivate and maintain an excellent image of genteelness which flies in the face of their true criminal inclinations.

The whole evidence before the court shows that these defendants are hardened criminals with the ability, opportunity and proclivity to continue their criminal activities in detriment of the general community.

## IV

In summary, the evidence at the trial and at the revocation of bail hearing shows and we find that:

1) Defendants Maldonado and Caballero were convicted by a jury for the substantive offense and for the conspiracy to obstruct, delay and affect commerce and the movement of articles and commodities in such commerce by extortion.

2) In the commission of those offenses Maldonado and Caballero kidnapped two persons, deprived them of their liberty for a number of days and kept them under constant fear of their lives until the ransom consisting of substantial amounts of money and jewelry was delivered to them.

3) The ransom was paid by the fathers of the victims under fear that the kidnappers would kill the victims.

4) At the time of the commission of those offenses Maldonado was a member of the faculty of the Police Academy of Puerto Rico and an investigator with a rank equivalent to Lt. Colonel.

5) Maldonado is the leader or mastermind and Caballero is the second in command or lieutenant of a large organization devoted to criminal activities of the most serious nature.

6) The criminal activities of that organization are far reaching and cover the island of Puerto Rico.

7) Maldonado is a corrupt police officer who has in turn corrupted and made part of his criminal organization other police officers of the Police of Puerto Rico.

8) Both Maldonado and Caballero will continue their path of criminal activities and Maldonado using his influence as a former high ranking police officer and his contacts within the Police Department will continue to corrupt other police officers in furtherance of his nefarious activities.

9) Maldonado's organization uses methods and techniques similar or identical to the methods and techniques used by bona fide police officers when detaining the victims thus creating the possibility that honest citizens may resist arrest or refuse to identify themselves when legally detained by real police officers thinking that they are going to be kidnapped by pretended police officers. This situation may have tragic consequences.

10) Maldonado and Caballero have participated in a substantial number of serious crimes, including murder, conspiracy to murder, kidnapping, conspiracy to kidnap, armed robbery and others of a like nature.

11) The incentive or motive for Maldonado and Caballero to abandon the jurisdiction of this court is real in spite of their roots in Puerto Rico and their record of appearances before this court due to the large number of serious crimes in which their participation is alleged by a Task Force composed of federal and local law enforcement officers, together with the possible large sentences that may be imposed for the crimes for which these two defendants now stand convicted. In fact, Caballero resorted to flight and avoided arrest for almost two months after the commission of the crimes charged in the indictment.

12) Notwithstanding their good reputation in the small community where they live, Maldonado and Caballero constitute a danger to the general community of Puerto Rico.

13) Maldonado and Caballero are hardened and professional criminals who will repeat their crimes unless restrained by

confinement. There is no guarantee that either greed, desire for pecuniary gain and disrespect for the law or pressures from their associates would not affect them with equal force while their appeals are being prosecuted.

14) Pecuniary gain is the only objective of Maldonado's and Caballero's criminal activities.

15) The high standards of living of these defendants cannot be maintained with their future honest income. Only reversion to their pattern of criminal behavior can provide enough money to sustain such standards of living.

16) Maldonado and Caballero pose a great danger to potential witnesses in the ongoing investigation in which their participation has been alleged. Cf. Jessica's case, above, in which a young woman who was a key witness to a crime was murdered while under police protective custody. Moreover, because of the danger posed by these two defendants, two of the witnesses presented in the instant case have been, are now and will remain for the unforeseeable future under the Witness Protection Program.

Furthermore, witness Rafael Irizarry, an agent with the local Bureau of Special Investigations who identified Maldonado as the driver of the automobile that picked up the ransom in the Consuegra kidnapping, participated in his arrest that same night and testified at the trial, narrated to the Probation Officer of this Court that Maldonado threatened to kill him. This was done in a hallway of this courtroom building when Maldonado pointing toward Irizarry his finger made the universal sign of firing a gun.[1A]

17) No possible set of measures can be fashioned to prevent these defendants from continuing with their serious criminal activities.

18) Denial of bail pending appeal and the immediate confinement of these two defendants is the only measure by which the general community of Puerto Rico can be shielded from their criminal activities.

■ In these circumstances, it would be a dereliction of duty for us to permit these defendants to remain at large and free to inflict further injury to the general community of Puerto Rico while their respective appeals are prosecuted. As stated by the court in *United States v. Oliver,* 683 F.2d 224 (7th Cir.1982), "[w]e are simply not prepared to assume responsibility for the risk to the community that (defendants') release would create". Id. at 236.

We have also consulted with the Probation Officer of this Court who is now in the final stages of the preparation of the presentence report and his findings lend additional support to our conclusions herein.[2] Cf. *United States v. Provenzano,* 605 F.2d 85 (3d Cir.1979).

## V

Before further continuing our discussion, it would be convenient to set forth the statutory and procedural provisions relevant to the issue before us. Rule 46(c) of the Federal Rules of Criminal Procedure provides:

"Eligibility for release pending sentence or pending notice of appeal, or expiration of the time allowed for filing notice of appeal, shall be in accordance with 18 U.S.C. 3148. The burden of establishing that the defendant will not flee or pose a danger to any other person or to the community rests with the defendant."

---

**1A.** *United States v. Gilbert,* 425 F.2d 490 (D.C. Cir.1969); *United States v. Wind,* 527 F.2d 672, 675 (6th Cir.1975).

**2.** The information provided indicates that Caballero was convicted of four different offenses consisting of possession of marihuana, transportation of marihuana, and violation of the weapons law for which he was sentenced for confinement for a period of two to five years. The execution of this sentence was suspended and he was placed on probation for a period of five years. As part of the same transaction he was convicted of another section of the weapons law and was sentenced to confinement of six months, the execution of which was also suspended.

Section 3148 of Title 18 provides in the pertinent:

"A person ... who has been convicted of an offense and .... has filed an appeal ... shall be treated in accordance with the provisions of Section 3146 unless the court or judge has reason to believe that no one or more conditions of release will reasonably assure that the person will not flee, or pose a danger to any other person or to the community. If such a risk of flight or danger is believed to exist, or if it appears that an appeal is frivolous or taken for delay, the person may be ordered detained." [3]

■ Under the provisions of the Bail Reform Act (18 U.S.C. Secs. 3146–3150) our consideration is limited to two pertinent criteria: the risk that defendants will flee and the risk that they will pose a danger if allowed to continue on bail. These risks must be measured "in terms of conduct that cannot be reasonably safeguarded against by an imposition of conditions upon the release". *United States v. Jackson,* 417 F.2d 1154, 1155 (D.C.Cir.1969) (per curiam). Bail should be denied only as a matter of last resort, that is, after the court has made a determination that no set of conditions for an applicant's release will reasonably assure that the person will not flee or pose a danger. 18 U.S.C. Sec. 3148 (1976); *United States v. Provenzano, supra,* at p. 94. Specifically, "the danger to the community posed by the defendant must be of such dimension that only his incarceration can protect against it". *Provenzano, supra,* at p. 94; *Chambers v. Mississippi,* 405 U.S. 1205, 1206, 92 S.Ct. 754, 755, 30 L.Ed.2d 773 (1972). The facts of the case at bar and our disposition of the same are in accordance with the principles enunciated in the aforementioned cases.

■ However, "[t]he burden of establishing that the defendant will not flee or pose a danger to ... the community rests with the defendant". Rule 9(c) The burden of proof is placed upon defendant in bail applications pending appeal because "the fact of his conviction justifies retention in custody in situations where doubt exists as to whether he can be safely released pending disposition of his appeal".[4] Notwithstanding, in this particular case the government has come forth with sufficient credible evidence supporting our findings. Cf. *Provenzano, supra,* at p. 96, footnote 56.

## VI

We have canvassed the case law and find that in the following cases although the evidence was not as compelling as in the instant case, reduction of bail and/or bail on appeal was denied:

In *Mecom v. United States,* 434 U.S. 1340, 98 S.Ct. 19, 54 L.Ed.2d 49 (1977), the Supreme Court, upholding the denial of an application for reduction of bail noted that the offense involved a large-scale smuggling enterprise of marihuana which was distributed to distant locations and that defendant's wife and another associate in the enterprise were still fugitive.

Also, in *Carbo v. United States,* 82 S.Ct. 662, 7 L.Ed.2d 769 (1962), the Supreme Court, following convictions for racketeering, extortion and conspiracy, denied bail pending appeal. In so doing, the Court noted that there was a probability of danger to witnesses in view of the repeated threats of injury to the person and family of the government's principal witness. Furthermore, the Court observed that applicant was the alleged ringleader of the conspiracy and stood to lose the most should he be faced with a new trial.

**3.** Section 3146(b) provides a statutory list of factors pertinent to the determination whether an applicant poses a risk of flight, including: 'the nature and circumstances of the offense charged, the weight of the evidence against the accused, the accused's family ties, employment, financial resources, character and mental condition, the length of his residence in the community, his record of convictions, and his record of appearance at court proceedings or of flight to avoid prosecution or failure to appear at court proceedings'.

**4.** See Advisory Committee Note to Fed.R. App.P. 9(c).

In *United States v. Oliver,* 683 F.2d 224 (7th Cir.1982), the court applying the danger to the community and potential for flight provision of 18 U.S.C. Sec. 3148, denied bail pending appeal by a felon convicted for receipt and possession of ammunition and firearms. The court considered that even though defendant had been convicted only for possessory offenses, "the nature of the offenses nevertheless encompasses a potential danger to human life. The court also noted that "[i]n the hands of an individual with a criminal background . . ., the risk that the firearm might be put to use is unacceptably high". The potential for flight factors were basically that defendant had no record of employment and he was a suspect in an armed robbery for which prosecutors intended to seek an indictment against him.

Likewise, in *United States v. Warwar,* 57 F.R.D. 645, affd. on other grounds 478 F.2d 1183 (1st Cir.1973), the court denied bail pending appeal from a guilty plea conviction involving the importation and possession of 1.1 pounds of cocaine. The court noted that the offense reflected a large-scale operation rather than an isolated case of importation and possession for personal use.

In *United States v. Hawkins,* 617 F.2d 59 (5th Cir.1980), *cert. denied* 449 U.S. 952, 101 S.Ct. 355, 66 L.Ed.2d 215, the court, in denying bail pending appeal from a conviction for conspiracy to import several drugs, concluded that defendant posed a threat to the community because of the possibility that he would continue trafficking in drugs while on bail. In so finding, the court noted that defendant had not shown any legitimate source for funds necessary "to acquire and maintain a cattle ranch for fine cattle, to live in an apartment with rent of more than $1,000 per month, and to continue (until re-incarcerated) the same high style of life engaged in before his arrest". The court also concluded that defendant "had been part of a large and well-financed drug operation and had not produced any substantial evidence indicating that he had severed his connection with it".

Similarly, in *United States v. Alvarez,* 548 F.Supp. 791 (S.D.Fla.1982), defendant was convicted of conspiracy to possess and distribute a very large amount of marihuana and cocaine and of aiding and abetting the utterance of counterfeit United States currency. In denying defendant's motion for bail pending appeal, the court concluded that defendant posed a threat to the community that was not limited to his potential to do physical harm and that he was financially capable to flight. The court was not convinced that defendant would engage in a non-illicit occupation and that he would cease to associate with drug dealers. The court reached the above conclusion notwithstanding the fact that defendant had resided in that community for an extended period of time (14 years), he had no record of prior criminal activity and he never failed to appear prior to or during the trial of the case.

In *United States v. Rabena,* 339 F.Supp. 1140 (D.C.Pa.1972), the court denied bail pending appeal to three convicted extortionists, each of whom had been associated with a vast network engaging in the illegal traffic of dangerous drugs. The court considered narcotics activities to be of great significance in so far as a "danger" determination was concerned, adding that the effect on the community of the sale of dangerous drugs speaks for itself, and that the clandestine nature of drugs sales indicated that there was a great likelihood that such illegal activities would continue. Additionally, the court concluded once it is considered likely that such illegal activities would resume if the defendants are released on bail so as to endanger the safety of the community, the bail should be denied.

The court held that bail pending appeal should be denied where "implicit in the jury's determination of guilt" was a finding that the extortion victim was kidnapped, beaten, tormented and threatened, to the extent that he feared for his very life. The court concluded that this finding alone could justify its conclusion based on danger to any other person within 18 U.S.C.A. Section 3148.

Additionally, in *United States v. Jackson,* 297 F.Supp. 601 (D.C.Conn.1969), the court denied bail pending appeal from a kidnapping conviction. The court related that the defendant had used a deadly weapon in hijacking a truck, had transported his kidnap victim at gunpoint from Connecticut to New Jersey, and had tied the victim to a tree leaving him to die.

In *United States v. Ursini,* 276 F.Supp. 993 (D.C.Conn.1967), the court denied bail pending appeal by two persons convicted of armed bank robbery. The court noted that one defendant had, shortly after the instant offense, urged a third party to join him in other crimes, including another bank robbery. The court further noted that the other defendant had, during his trial, lunged at a witness, thereby displaying "at best an uncontrollable temper, at worst a depth of hostility and the venom to which other persons and the community should not be subjected".

Finally, the court mentioned that all key witnesses lived in close proximity to the defendants, with one of the witnesses having already been threatened following his trial testimony, while the defendants were released on bail.

Furthermore, in *United States v. Bond,* 329 F.Supp. 538 (D.C.Tenn.1971), the court denied bail pending appeal of a bank robbery conviction where there was trial testimony to the effect that the defendant entered into periodic episodes of increasing mental tension, leading to crises of explosive antiauthority behavior.

In *United States v. Louie,* 289 F.Supp. 850 (D.C.Cal.1968), the court denied bail pending appeal from a conviction for the unlawful interstate transportation of forged securities. It was noted that the defendant conceded that he had consistently over a period of years operated as a confidence man. In light of dilatory tactics and incredible protestations urged in some of the six or seven criminal proceedings pending against the defendant in both federal and state courts, the court concluded that release on bail pending appeal should not be granted.

Moreover, in *United States v. Allen,* 343 F.Supp. 549 (D.C.Pa.1972), the court denied bail pending sentencing of a person convicted of bank robbery. The court noted that the bank robbery offense involved a "getway chase straight from the movies" and numerous shots were exchanged with pursuing officers. The court also noted that the defendant had a prior criminal record revealing other gun related incidents.

In *United States v. Baca,* 444 F.2d 1292 (10th Cir.1971), *cert. denied* 404 U.S. 979, 92 S.Ct. 347, 30 L.Ed.2d 294, the court alluded to a defendant's threat against the lives of two arresting police officers in support of its affirmance of the trial court's permanent revocation of an appeal bond under the danger to any other person or to the community provision of 18 U.S.C.A. Section 3148.

Also, in *United States v. Blyther,* 407 F.2d 1279 (D.C.Cir.1969), *cert. denied* 394 U.S. 953, 89 S.Ct. 1296, 22 L.Ed.2d 488, the court affirmed denial of bail pending appeal from a conviction of carrying a dangerous weapon after conviction of a felony. The court held that considering defendant's record including the present conviction and his failure to comply with prior probation and release requirements no one or more conditions of release would reasonably assure that the defendants would not pose a danger to the community if released.

In *United States v. Tropiano,* 296 F.Supp. 280 (D.C.Conn.1968), the court denied bail pending imposition of a sentence, for three defendants convicted of extortion and attempted extortion by the wrongful use of threatened force, violence, and fear directed at a refuse removal business, finding that release of each of the defendants would pose a distinct danger to the other persons and to the community within 18 U.S.C.A. Sec. 3148. The court noted that the very crimes for which the defendants had been convicted involved the wrongful use of force, violence or fear. The court further noted that the contacts in which the defendants, by their own words and actions, sought to induce fear in their victims took on particular significance in view of the

defendants' very bad reputations which they themselves brought home to the victim.

Likewise, in *United States v. Sutton*, 322 F.Supp. 1320 (D.C.Cal.1971), the court held that the release of a defendant pending appeal of his conviction for conspiracy to import and conceal marihuana would be denied under 18 U.S.C.A. Sec. 3148, as posing a danger to any other person to wit, to a co-defendant who had become a key prosecution witness. It was noted that during trial, the defendant, among others, had made threats against the co-defendant which made it clear "overtly and covertly, expressly and impliedly" that the co-defendant would likely suffer great bodily harm and even death because of his incriminating eye witness' testimony. The court concluded that it was clear from the language of Section 3148 that protection of a witness is a proper consideration in determining whether post conviction bail should be permitted.

## VII

We finally address defendants' challenge to the admissibility of the hearsay testimony of Special Agent Jeffrey Hill of the F.B.I. at the hearing for revocation of bail pending appeal.

Special Agent Hill testified to obtaining information from reliable informants and sources, such as, electronic surveillance which confirmed the participation of defendants Maldonado and Caballero along with others as more fully stated above. Even though, Special Agent Hill did reveal the source of the list of crimes presented at the hearing, the government represented that it had evidence of further criminal activity which could not be revealed without jeopardizing its ongoing investigation of a large criminal organization. We therefore conducted an in camera hearing where the transcripts of recorded conversations—

whose secrecy is protected by Title III of the Omnibus Crime Act—were produced with certain deleted portions [5] to attorneys for both sides for their perusal. We sealed these transcripts and placed them under the custody of the clerk of the court to be maintained under seal until further order.

Defendants have objected to the complete testimony of the government agent as being hearsay testimony. Nevertheless, Rule 1101(d)(3) of the Federal Rules of Evidence provides that proceedings with respect to release on bail or otherwise (and obviously those in which the court decides not to release on bail) do not call for application of the rules of evidence.[6]

The governing statute concerning release on bail, 18 U.S.C.A. Section 3146(f) specifically provides:

"Information stated in, or offered in connection with, any order entered pursuant to this section need not conform to the rules pertaining to the admissibility of evidence in a court of law."

■ Therefore, we are of the opinion that hearsay evidence can be properly admitted in proceedings of this nature if such evidence is reliable and credible as in the instant case. But, even if we were to disregard the hearsay evidence, still enough non-hearsay evidence will remain that taken together with the circumstances and the manner of execution of the offenses for which the defendants stand convicted, would support our conclusion that bail should be denied.

WHEREFORE, in view of the foregoing, defendants' motions for an order releasing them on bail during the pendency of their appeals are hereby DENIED. Defendants are remanded to the custody of the Attorney General of the United States until their respective appeals are prosecuted.

SO ORDERED.

---

5. These deletions were made by the court so as not to reveal certain names and other information which are not pertinent to this case and/or are the subject of an ongoing investigation.

6. *United States v. Montemayor*, 666 F.2d 235, 237 (5th Cir.1982); *United States v. Wind, supra*, 527 F.2d at 675; *U.S. v. Graewe*, 689 F.2d 54, 55, n. 1 (6th Cir.1982); *United States v. Brown*, 399 F.Supp. 631 (W.D.Okla.1975).